## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISON

DR. HADDISH MELAKEBERHAN,

     Plaintiff,                              Case No.

v.                                            Hon.

THE BOARD OF TRUSTEES OF
MICHIGAN STATE UNIVERSITY,

     Defendant.

---

David A. Nacht (P47034)
Grace Cathryn Cretcher
NACHTLAW, P.C.
*Attorneys for Plaintiff*
501 Avis Drive, Suite 3
Ann Arbor, MI 48108
(734) 663-7550
dnacht@nachtlaw.com
gcretcher@nachtlaw.com

---

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff DR. HADDISH MELAKEBERHAN ("Plaintiff"), by and through his attorneys, NACHTLAW, P.C., and hereby alleges as follows:

## INTRODUCTION

1.    Plaintiff's claims arise out of the discriminatory treatment based on race, national origin, and now, age, which he has faced for decades and continues to face to the present day as a member of the Michigan State University ("MSU") faculty.

2.      For three decades, Plaintiff has been a well-respected Assistant Professor at MSU, and he has become a world-renowned expert on the role of nematodes – or roundworms – in agriculture.

3.      Plaintiff has been invited to speak at nearly a dozen conferences on five different continents, and his research on the subject has been cited well over a hundred times.

4.      Despite this impressive track record, Plaintiff has consistently faced discriminatory treatment as the only Black and African individual among the 36 faculty members in the Department of Horticulture at MSU's College of Agriculture and Natural Resources ("CANR"). This discriminatory treatment has only intensified as Plaintiff has become one of the oldest CANR faculty members as well.

5.      Plaintiff brings this action against Defendant for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*.

## PARTIES, JURISDICTION, AND VENUE

6.      Plaintiff is a 72-year-old Black man of African origin, a resident of Lansing, Michigan, and a tenured Assistant Professor in the Department of Horticulture at MSU's College of Agriculture and Natural Resources ("CANR").

7.      Defendant Board of Trustees of Michigan State University is the publicly elected governing body of MSU, a publicly funded and state-operated

university located in East Lansing, Michigan. MSU receives state and federal funding for the provision of higher education.

8.    This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

9.    Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 16, 2024, and was issued a Notice of Right to Sue on November 7, 2024.

10.    Venue is proper in this District as the events underlying this Complaint occurred in East Lansing, Michigan, within the Western District of Michigan.

## FACTUAL ALLEGATIONS

11.    In or around 1990, Plaintiff began his work at MSU as a post-doctoral researcher of nematodes and their effects on common Michigan crops including cherries, corn, and soybeans.

12.    In or around 1994, Plaintiff was made an Assistant Professor at MSU.

13.    Since joining the faculty, Plaintiff has become a world-renowned expert on the role of nematodes in agriculture, receiving invitations to speak at near a dozen conferences on five different continents and producing research on the subject that has been cited well over a hundred times.

14.     Unfortunately, despite his success, Plaintiff has consistently received less favorable treatment in the terms and conditions of his employment than his non-black, non-African, and younger colleagues.

15.     This disparate treatment has manifested in three key forms, each of which has had a material impact on Plaintiff's ability to complete his research and succeed professionally: commodities funding, promotion and compensation, and field quarantining.

**a. Commodities Funding**

16.     Most devastatingly to his career, Plaintiff has been deprived of commodities funding for his research, fostering a hostile work environment and depriving him of the tools needed to move his research forward.

17.     Plaintiff became a visiting Assistant Professor at MSU in 1992, allowing him to write his own grant proposals. He developed a proposal based on his Ph.D. work and in 1993 successfully obtained a 3-year USDA grant to fund it.

18.     This led to his hiring as a tenure-stream Assistant Professor in the MSU Entomology Department in February of 1994, at which point his task was to develop a program based on his research with a connection to state commodities (such as soybeans) in order to effectively access funding for his work.

19.     In the field of agricultural research, commodities funding can account for 30-50% of research funding, making it a veritable necessity.

4

20.    Faculty are assigned commodities responsibility by the department and college in consultation with higher administration, and Plaintiff's former colleague Dr. George Bird was the nematologist to whom all Michigan commodities were assigned at the time of Plaintiff's hire.

21.    This kind of affiliation with state commodity groups is crucial to the work of researchers like Plaintiff because these groups form the foundation of the funding pipeline for state, regional, and federal grants.

22.    It is impossible to get funding for applied research like Plaintiff's without financial and logistical support from these commodity groups; for example, the executive directors of these groups are responsible for submitting grant proposals to the USDA, and only researchers with commodity responsibility are awarded such funding.

23.    When Plaintiff raised the funding and access issues he was facing in the Entomology Department with then-CANR Dean Jeffrey Armstrong after receiving tenure, Dean Armstrong's only suggestions were to change his focus to molecular rather than applied nematology (on which all Plaintiff's prior work and scholarship were based) and/or take advantage of MSU's counseling services.

24.    Finally, in 2006, Plaintiff's reporting line was transferred from the Department of Entomology to the Office of Senior Associate Dean Frank Fears, where it remained until he moved into the Department of Horticulture in 2010.

25.    Around the same time, two white male faculty members who were also dealing with issues within their departments – Dr. Edward Walker, at the time Distinguished Professor of Entomology, now Distinguished Professor of Microbiology with a partial appointment in the Department of Entomology, and Dr. David Skole, Professor, Department of Forestry – were simply moved into other departments so their professional trajectories remained uninterrupted.

26.    As a result, Plaintiff was forced to do what he could to make progress in his scholarship and career without access to commodities funding while awaiting Dr. Bird's retirement and the opportunity to work directly with commodity groups.

27.    Unfortunately, however, to Plaintiff's total shock and dismay after decades of applied nematology work at MSU, upon Dr. Bird's retirement, his young former student Dr. Marisol Quintanilla was hired as an "applied nematologist" to take over his responsibility for all Michigan crops.

28.    In fact, Plaintiff remains the only researcher engaged in similar agricultural work across the Departments of Horticulture, Entomology, and Plant, Soil and Microbial Sciences at MSU not assigned responsibility for a single Michigan commodity.

29.    Despite his repeated protestations, established connections with commodity funding sources have been deliberately kept from Plaintiff's access, and instead transferred to younger colleagues with lighter skin.

30.    As a result, since 2006, Plaintiff has had to contribute up to $15,000 of his own money per year to keep his program running.

**b.  Promotion and Compensation**

31.    Further, despite the acclaim Plaintiff's research has consistently received worldwide, MSU has failed to appropriately promote or compensate him since his appointment to the faculty.

32.    Plaintiff was denied promotion to full Professor in 2009 and 2015. These denials occurred after the publication of his novel research models that apply biological, ecological, and mathematical principles to relate changes in nematode population dynamics in response to agricultural practices and identify the sustainability of soil health outcomes.

33.    In fact, leadership in Plaintiff's department is well aware that the novelty and importance of his work is not fully appreciated by the MSU system or federal funding agencies, as is clearly demonstrated by the department's 2024 offer to pay for a multi-day trip for Plaintiff to further explain the details of the relevant models to the USDA.

34.    Because Plaintiff was stripped of his departmental affiliation between 2006 and 2010, he was unable to admit graduate students, teach nematology courses, or receive evaluation letters during this time.

35.    Furthermore, as he had no departmental affiliation, the customary department-wide seminar was not organized to consider his candidacy for full Professor in 2009.

36.    Instead, Associate Dean Fears organized his own special committee of 4 professors to evaluate Plaintiff's promotion package.

37.    Accordingly, the votes of these 4 professors chosen by Associate Dean Fears were given the same weight as the evaluations of his peers' departmental colleagues and department chairs.

38.    Additionally, Associate Dean Fears informed Plaintiff that his outside letters of support from national and international experts were excellent, but his candidacy was nevertheless unsuccessful.

39.    Furthermore, any and all attempts by Plaintiff to seek full Professor status that have or could occur are fatally hobbled by MSU's ongoing discriminatory refusal to assign him direct responsibility for work on Michigan commodities and his resulting inability to secure either associated commodities funding or the local, regional, and federal grants obtained via applications submitted by those very commodities groups themselves.

40.    This is clearly demonstrated by the fact that the main reasoning for denying Plaintiff full Professorship in 2015 was the purportedly modest amount of funding he had been able to secure.

8

41.    In fact, however, the number of students and postdoctoral researchers Plaintiff was able to train, and the amount of funding he was able to generate between 2000 and 2014, are markedly impressive when considered in the context of his complete lack of the access to relevant commodities groups enjoyed by every single one of his colleagues who are engaged in similar research.

42.    For the past two decades, Plaintiff has repeatedly raised with departmental and administration leadership the fact that Defendant has forced him to contend with enormous obstacles not faced by his younger, white, and/or non-African peers.

43.    In fact, over the years, Plaintiff has repeatedly raised with MSU leadership the near impossibility of obtaining adequate funding without commodity support and proposed the equitable reorganization of MSU nematology's approach to working with state commodities, only to be virtually totally ignored.

44.    While Plaintiff has been consistently shut out of access to funding sources and denied promotion based on this very inability to access funding sources for the past decade and a half, younger white colleagues, including Dr. Donatien-Pascal Kamden and Dr. Larry Gut, were promoted to full Professor after as little as two years as an Assistant Professor.

45.    Being in the tenure system for over 24 years without receiving a promotion is virtually unheard of for a faculty member with consistent research and graduate student output and no disciplinary or conduct issues.

46.    In addition to a consistent failure to promote, as recently as September 2019, Plaintiff was paid just 65% of the salary earned by his cohort.

47.    When Plaintiff asked for a raise to a more equitable level, his salary was increased to 75% of that of the average individual within his cohort, effective October 2019.

48.    When Plaintiff further pressed the issue in July 2019, he highlighted the gap between his increased salary and that of the average individual in his cohort.

49.    Over five years later, his pay has not been further increased, and he is currently earning less than 75% of the salary received by his white peers.

50.    Finally, Plaintiff filed a complaint with the MSU OIE in July of 2022.

51.    Despite Plaintiff's submission of copious evidence of discrimination in interview and documentary form, OIE closed the investigation of his complaint in November of 2023, declining to acknowledge the pervasive and ongoing discrimination he has faced at MSU or to provide any avenue for redress whatsoever.

52.    Plaintiff's struggles for both position and pay are not shared by the other professors of his department, all of whom are white and most of whom are younger than him.

53.    Following his complaint to OIE and filing of an EEOC Charge of Discrimination, Plaintiff received his first "does not meet expectations" evaluation in over 30 years at MSU, without valid cause or justification.

**c.  Field Quarantining**

54.    In seeking tenure at MSU, Plaintiff focused on the soybean cyst nematode ("SCN"), which causes billions of dollars in crop loss annually.

55.    Despite this, government quarantining of the organism was lifted in the mid-1960s.

56.    In order to study the SCN effectively, Plaintiff sought land on campus on which to conduct his research, which came with quarantine restrictions requiring the washing of all parts of vehicles that touch soil in his field, despite Plaintiff's repeatedly raising the fact that the SCN is not a quarantined organism with the relevant parties at MSU.

57.    This unnecessary quarantine has been a high budgetary burden and inconvenience for Plaintiff's program, requiring him to buy a truck and associated washing facility and pay for the work of specialized personnel.

58.    He has even been forced to buy his own no-till planter and small plot harvester using personal funds, and this unnecessary quarantining requirement has resulted in Plaintiff's land and work being seen by his peers as a contamination risk despite the fact that the SCN is found throughout the non-quarantined areas where

hundreds of MSU research vehicles regularly travel with no washing or other restrictions whatsoever.

59.    As far as Plaintiff is aware, to date, none of his nematologist or non-nematologist peers in the nation deal with such restrictions on study of the SCN.

60.    This has posed and continues to pose extreme barriers to Plaintiff's research, as any equipment that enters his field must undergo an hours-long washing procedure before entering another field, which restricts his access to this vital equipment.

61.    This is the case even though these nematodes are present all over the state, in fields where the relevant MSU equipment is used on a regular basis without any such disinfection required.

62.    The arbitrary and capricious nature of this quarantine – illustrated clearly by the fact that the very same equipment Plaintiff is required to disinfect travels through other fields containing SCN without disinfection on a regular basis – demonstrates the discriminatory nature of this barrier to Plaintiff's work. Such measures are worthless and nonsensical unless they apply to all MSU fields.

63.    Plaintiff's former non-black and non-African colleague, Dr. Bird, and younger, non-black and non-African colleague, Dr. Quintanilla, had or have similar levels of SCN in their fields, but Dr. Bird was never subject to quarantining, and Dr.

Quintanilla only became subject to these procedures after Plaintiff pursued a discrimination case with the MSU Office of Institutional Equity ("OIE").

64.     Dr. Bird introduced the SCN at two different field research locations on the MSU campus many years before Plaintiff's work with the organism began, and one of these locations was transferred to Dr. Quintanilla when she was hired in approximately 2016.

65.     While Plaintiff's field has been fenced and under quarantine for over two decades, despite working with the exact same organism as Plaintiff, no such requirements were placed on Dr. Bird's or Dr. Quintanilla's fields until after Plaintiff repeatedly raised this issue with MSU's higher administration.

66.     Finally, in 2020, MSU announced a sanitation protocol that applied to both Plaintiff and Dr. Quintanilla, but the fields into which Dr. Bird introduced the SCN remained unfenced until 2023.

67.     As a result, until 2023, Plaintiff's fields were the only fields subject to quarantine procedures in the entirety of MSU.

## COUNT I
### Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964
### 42 U.S.C. § 2000e *et seq.*

68.     Plaintiff incorporates the preceding allegations as if fully restated herein.

69.    At all relevant times, Defendants employed greater than 15 employees and Plaintiff was an employee covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e(b) and (f).

70.    Title VII prohibits discrimination in employment on the basis of race.

71.    Plaintiff was well qualified for his faculty position at MSU.

72.    Defendants subjected Plaintiff to intentional discrimination based on his race by unnecessarily and inequitably quarantining his research fields, excluding him from commodities funding, and obstructing and limiting his promotion and compensation, while also treating white coworkers more favorably.

73.    Bias against Black people was a motivating factor behind Defendant's actions.

74.    Defendants applied their policies and procedures in a manner that discriminated against Plaintiff on the basis of race, causing him serious and unjustified damage.

75.    Based on the foregoing, Plaintiff was subjected to biased, prejudiced, and unfair treatment in violation of Title VII.

76.    Defendants' actions were taken in reckless disregard of Plaintiff's federally protected civil rights, entitling him to punitive damages.

77.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not

limited to, significant and material obstruction of his career and research; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and he will continue to so suffer in the future.

## COUNT II
### National Origin Discrimination in Violation of Title VII of the Civil Rights Act of 1964
### 42 U.S.C. § 2000e *et seq*.

78.    Plaintiff incorporates the preceding allegations as if fully restated herein.

79.    At all relevant times, Defendants employed greater than 15 employees and Plaintiff was an employee covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e(b) and (f).

80.    Title VII prohibits discrimination in employment on the basis of national origin.

81.    Plaintiff was well qualified for his faculty position at MSU.

82.    Defendants subjected Plaintiff to intentional discrimination based on his national origin by unnecessarily and inequitably quarantining his research fields, excluding him from commodities funding, and obstructing and limiting his promotion and compensation, while also treating American coworkers more favorably.

83.   Bias against African people was a motivating factor behind Defendant's actions.

84.   Defendants applied their policies and procedures in a manner that discriminated against Plaintiff on the basis of national origin, causing him serious and unjustified damage.

85.   Based on the foregoing, Plaintiff was subjected to biased, prejudiced, and unfair treatment in violation of Title VII.

86.   Defendants' actions were taken in reckless disregard of Plaintiff's federally protected civil rights, entitling him to punitive damages.

87.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, significant and material obstruction of his career and research; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and he will continue to so suffer in the future.

## COUNT III
### Retaliation in Violation of Title VII of the Civil Rights Act of 1964
### 42 U.S.C § 2000e *et seq*.

88.   Plaintiff incorporates the preceding allegations as if fully restated herein.

89.    At all relevant times, Defendant was an employer with greater than 15 employees and Plaintiff was an employee covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e(b).

90.    Plaintiff engaged in conduct protected by Title VII when he made a report of discrimination to MSU's OIE and filed an EEOC Charge of Discrimination.

91.    But for this protected conduct, Plaintiff would not have received a retaliatory negative performance review.

92.    Defendant's actions constitute unlawful retaliation against Plaintiff because in response to this protected activity, Defendant subjected him to an unfairly negative performance review in support of its ongoing discriminatory refusal to promote him to full professor.

93.    Defendants' actions were taken in reckless disregard of Plaintiff's federally protected civil rights, entitling him to punitive damages.

94.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, significant and material obstruction of his career and research; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and he will continue to so suffer in the future.

## COUNT IV
### Age Discrimination in Violation of the ADEA

**29 U.S.C. § 621 *et seq*.**

95.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

96.    At all relevant times, Defendant was an employer with more than 20 employees, and Plaintiff was an employee covered by and within the meaning of the ADEA.

97.    Plaintiff is a member of a protected group because he is over the age of 40.

98.    Defendant was predisposed to discriminate on the basis of age and acted in accordance with that predisposition.

99.    Defendant subjected Plaintiff to intentional discrimination based on his age by treating him less favorably than similarly situated younger coworkers in the terms and conditions of his employment.

100.    But for Plaintiff's age, Defendant would not have subjected him to this disparate treatment.

101.    Defendant's actions constitute unlawful discrimination against Plaintiff because of his age pursuant to 29 U.S.C. § 623(a).

102.    Defendants' actions were taken in willful disregard of Plaintiff's federally protected civil rights, entitling him to liquidated damages.

103.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, significant and material obstruction of his career and research; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and he will continue to so suffer in the future.

## COUNT V
### Retaliation in Violation of the ADEA
### 29 U.S.C. § 621 *et seq*.

104.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

105.    At all relevant times, Defendant was an employer with more than 20 employees, and Plaintiff was an employee covered by and within the meaning of the ADEA.

106.    Plaintiff engaged in conduct protected by the ADEA when he made a report of discrimination to MSU's OIE and filed an EEOC Charge of Discrimination.

107.    But for this protected conduct, Plaintiff would not have received a retaliatory negative performance review.

108.    Defendant's actions constitute unlawful retaliation against Plaintiff because in response to this protected activity, Defendant subjected him to an unfairly

negative performance review in support of its ongoing discriminatory refusal to promote him to full professor.

109.    Defendants' actions were taken in willful disregard of Plaintiff's federally protected civil rights, entitling him to liquidated damages.

110.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, significant and material obstruction of his career and research; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and he will continue to so suffer in the future.

## RELIEF REQUESTED

For all the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

a.    A declaration that the practices and actions of Defendants are unlawful employment practices in violation of Title VII and the ADA;

b.    Compensatory damages in whatever amount he is found to be entitled;

c.    Exemplary, punitive, and/or liquidated damages in whatever amount he is found to be entitled;

d.    Interest, costs, reasonable attorney fees, and expert witness fees;

e.    Equitable relief, including an injunction prohibiting any further acts of wrongdoing against him; and

f.    Whatever other relief this Court finds appropriate.

Respectfully Submitted,

NACHTLAW, P.C.

*/s/ David A. Nacht*
David A. Nacht (P47034)
Grace Cathryn Cretcher
*Attorneys for Plaintiff*
501 Avis Dr, Ste. 3
Ann Arbor, MI 48108
(734) 663-7550

Dated: February 3, 2025

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISON**

DR. HADDISH MELAKEBERHAN,

     Plaintiff,                         Case No.

v.                                  Hon.

THE BOARD OF TRUSTEES OF
MICHIGAN STATE UNIVERSITY,

     Defendant.

---

David A. Nacht (P47034)
Grace Cathryn Cretcher
NACHTLAW, P.C.
*Attorneys for Plaintiff*
501 Avis Drive, Suite 3
Ann Arbor, MI 48108
(734) 663-7550
dnacht@nachtlaw.com
gcretcher@nachtlaw.com

---

## **JURY DEMAND**

NOW COMES Plaintiff DR. HADDISH MELAKEBERHAN, by and through his attorneys, NACHTLAW, P.C., and hereby demands a trial by jury in the above-captioned matter for all issues so triable.

                Respectfully Submitted,

                NACHTLAW, P.C.
                */s/ David A. Nacht*
                David A. Nacht (P47034)
                Grace Cathryn Cretcher
                *Attorneys for Plaintiff*

Dated: February 3, 2025