UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HADDISH MELAKEBERHAN,

    Plaintiff,

v.

MICHIGAN STATE UNIVERSITY
BOARD OF TRUSTEES, et al.,

    Defendants.

_____/

Case No. 1:25-cv-126

Hon. Hala Y. Jarbou

## **OPINION**

Plaintiff Haddish Melakeberhan brings this employment discrimination lawsuit against Defendants Michigan State University ("MSU") Board of Trustees; William Baird, Chair of the MSU Department of Horticulture, in his official capacity only; and Matthew Daum, Interim Dean of the MSU College of Agriculture and Natural Resources ("CANR"), in his official capacity only. (Am. Compl., ECF No. 14.)  Melakeberhan alleges that Defendants discriminated against him on the basis of race and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; retaliated against him for reporting discrimination, in violation of Title VII; discriminated against him on the basis of age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*; and retaliated against him for reporting discrimination, in violation of the ADEA.  He seeks a declaratory judgment, monetary damages, and injunctive relief.

On June 27, 2025, Defendants moved to partially dismiss Melakeberhan's amended complaint for failure to state a claim and/or lack of subject matter jurisdiction.  (ECF No. 21.) Specifically, Defendants argue that (1) Melakeberhan's Title VII claims against Baird and Daum

in their official capacities are duplicative; (2) Melakeberhan's ADEA discrimination and retaliation claims do not sufficiently allege wrongdoing by Baird and Daum to overcome sovereign immunity; and (3) Melakeberhan's ADEA retaliation claims do not sufficiently allege ongoing violations of federal law to overcome sovereign immunity. Melakeberhan consented to the dismissal of his Title VII claims against Baird and Daum (Pl.'s Resp. 2-3, ECF No. 28), so the Court will dismiss those claims. Melakeberhan's Title VII claims against the Board of Trustees, which Defendants did not move to dismiss, remain in the case. As to the ADEA claims, the Court will deny the motion to dismiss for the reasons explained below.

## I. BACKGROUND

Melakeberhan is a tenured Assistant Professor in the Department of Horticulture within CANR, where he studies the agricultural impact of nematodes (i.e., roundworms). (Am. Compl. ¶¶ 2, 6.) Melakeberhan is 72 years old, Black, and of African origin. (*Id.* ¶ 6.) He has worked at MSU since around 1990, and became an Assistant Professor around 1994. (*Id.* ¶¶ 13-14.) According to his complaint, Melakeberhan is "a world-renowned expert," has been invited to speak at almost "a dozen conferences on five different continents," and has written papers "that ha[ve] been cited well over a hundred times." (*Id.* ¶ 15.) However, he alleges that during his time at MSU, the university has mistreated him in several ways.

First, Melakeberhan alleges that MSU has never allowed him to obtain funding in connection with state agricultural commodities. (*Id.* ¶¶ 18, 20.) Commodities funding is "a veritable necessity" in agricultural research because it makes up about 30 to 50% of research funding. (*Id.* ¶ 21.) Thus, connections with state commodity groups are essential to obtaining funding, especially for applied research such as Melakeberhan's. (*Id.* ¶¶ 23-24.) The department and college decide which professors have "commodities responsibility," which ultimately determines which professors can get funding for their work. (*See id.* ¶¶ 22-24.)

2

Since Melakeberhan became a tenure-track professor in 1994, MSU has always assigned commodities responsibility to faculty members other than him. (*See id.* ¶¶ 18, 20, 25-30.) When Melakeberhan raised his funding issues with Jeffrey Armstrong, then the Dean of CANR, Armstrong said he could switch from doing applied nematology to molecular nematology—even though all of his prior work was in the former field. (*Id.* ¶ 25.) Melakeberhan expected to gain commodities responsibility upon the retirement of a former colleague of his, Dr. Bird, but instead MSU hired Dr. Bird's former student, Dr. Quintanilla—who is younger than Melakeberhan, non-Black, and non-African—as an applied nematologist, and assigned Dr. Bird's prior commodities responsibilities to Quintanilla. (*Id.* ¶¶ 29, 65.) Melakeberhan alleges that he is "the only researcher engaged in similar agricultural work across the Departments of Horticulture, Entomology, and Plant, Soil and Microbial Sciences at MSU not assigned responsibility for a single Michigan commodity." (*Id.* ¶ 30.) The lack of funding has forced Melakeberhan "to contribute up to $15,000 of his own money per year to keep his program running." (*Id.* ¶ 32.) Melakeberhan has repeatedly raised the commodities funding issue with MSU leadership, but the situation has not improved. (*Id.* ¶ 42.) Thus, Melakeberhan asserts that MSU "ha[s] forced him to contend with enormous obstacles not faced by his younger, white, and/or non-African peers." (*Id.* ¶ 44.)

Second, Melakeberhan alleges that MSU has discriminated against him in terms of promotion and compensation. Although Melakeberhan has made significant scholarly contributions to his field in the form of novel research methods, MSU declined to promote him to full Professor in 2009 and 2015. (*See id.* ¶¶ 33-35.) And in 2006, Melakeberhan was moved out of the Department of Entomology, where he had previously worked, and instead told to report to Senior Associate Dean Frank Fears. (*Id.* ¶ 26.) Between 2006 and 2010 (when Melakeberhan was moved to the Department of Horticulture), Melakeberhan had no departmental affiliation and thus

could not "admit graduate students, teach nematology courses, or receive evaluation letters." (*Id.* ¶¶ 26, 36.) However, around this time, two white faculty members who had issues with their departments "were simply moved into other departments so their professional trajectories remained uninterrupted." (*Id.* ¶ 27.)

In 2009, because Melakeberhan had no departmental affiliation, his promotion was evaluated by a special committee convened by Associate Dean Fears. (*Id.* ¶ 38.) Ultimately, Fears told Melakeberhan "that his outside letters of support from national and international experts were excellent," but Melakeberhan did not receive tenure. (*Id.* ¶ 40.) In 2015, Melakeberhan was again denied tenure, primarily because he had not obtained enough funding during his career. (*Id.* ¶ 42.) This lack of funding, Melakeberhan alleges, was attributable to MSU's failure to assign him commodities responsibility. (*Id.* ¶ 41.) And though Melakeberhan has been an Assistant Professor for 24 years without being promoted—which he alleges is "virtually unheard of for a faculty member with consistent research and graduate student output and no disciplinary or conduct issues"—at least two younger white colleagues "were promoted to full Professor after as little as two years as an Assistant Professor." (*Id.* ¶¶ 46-47.) In 2019, Melakeberhan's salary was only 65% of what the average faculty member in his cohort made. (*Id.* ¶ 48.) In October 2019 it increased to 75% of the average, but it has not increased since. (*Id.* ¶¶ 49, 51.) Thus, Melakeberhan asserts that his "struggles for both position and pay are not shared by the other professors of his department, all of whom are white and most of whom are younger than him." (*Id.* ¶ 54.)

Third, Melakeberhan alleges that MSU has forced him to implement unnecessary quarantine procedures that have hindered his ability to do research. Specifically, Melakeberhan studies the soybean cyst nematode ("SCN"), which was at one time required to be quarantined due

4

to the potential for crop damage, but has not been under government-ordered quarantine since the 1960s.  (*Id.* ¶¶ 56-57.)  However, since Melakeberhan began studying the SCN in a field on MSU's campus, the university has required him to use burdensome quarantining procedures.  (*Id.* ¶ 58.)  In order to comply with these procedures, Melakeberhan has had "to buy a truck and associated washing facility . . . pay for the work of specialized personnel," and "buy his own no-till planter and small plot harvester using personal funds."  (*Id.* ¶¶ 59-60.)   Further, "any equipment that enters his field must undergo an hours-long washing procedure before entering another field."  (*Id.* ¶ 62.)  Melakeberhan alleges that the quarantine procedures are entirely arbitrary, as the SCN is "present all over the state, in fields where the relevant MSU equipment is used on a regular basis without any such disinfection required."  (*Id.* ¶¶ 63-64.)  Indeed, to Melakeberhan's knowledge, "none of his nematologist or non-nematologist peers in the nation deal with such restrictions on study of the SCN."  (*Id.* ¶ 61.)  At MSU, Dr. Quintanilla and (previously) Dr. Bird—who are non-Black and non-African—were not required to implement quarantine protocols even though their fields have SCN at similar levels to Melakeberhan's.  (*Id.* ¶ 65.)  MSU finally required similar protocols in these fields in 2020, after Melakeberhan had repeatedly pointed out the discrepancy.  (*Id.* ¶¶ 67-69.)

In July 2022, Melakeberhan filed a discrimination complaint with the MSU Office of Institutional Equity ("OIE").  (*Id.* ¶ 52.)  In November 2023, OIE closed the investigation without a finding of discrimination.  (*Id.* ¶ 53.)  In February of the following year, Melakeberhan filed a Charge of Discrimination with the federal Equal Employment Opportunity Commission (EEOC).  (*Id.* ¶ 11.)  Melakeberhan alleges that after his complaints to the OIE and the EEOC, he "received his first 'does not meet expectations' evaluation in over 30 years at MSU, without valid cause or

5

justification." (*Id.* ¶ 55.)  Thus, he contends that the negative performance review was motivated by his discrimination complaints.  (*Id.* ¶¶ 93, 108.)

## II. LEGAL STANDARDS

### A. Rule 12(b)(6)

A complaint may be dismissed for failure to state a claim if it fails "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Id*. (quoting Fed. R. Civ. P. 8(a)(2)).  When considering a motion to dismiss under Rule 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true."  *Parrino*, 869 F.3d at 397.

### B. Rule 12(b)(1)

The standard for evaluating a Rule 12(b)(1) motion depends on the nature of the "attack" on subject matter jurisdiction.  A "facial attack" on subject matter jurisdiction "merely questions the sufficiency of the [complaint]."  *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325

(6th Cir. 1990). Facial attacks are reviewed under the same standard as applied to a Rule 12(b)(6) motion: the Court accepts the plaintiff's well-pleaded allegations as true and asks whether subject matter jurisdiction exists based on the complaint. *Id.* No presumption of truth applies in a "factual attack" on subject matter jurisdiction. *Id.* Factual attacks challenge the existence of jurisdiction based on facts outside the pleadings. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). When a factual attack is made, the Court has "broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists[.]" *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014).

Defendants seek dismissal of the complaint based on sovereign immunity, which goes to the Court's jurisdiction. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015). Because Defendants' argument is based on the allegations in the complaint, the Court treats this as a facial attack on subject matter jurisdiction.

### III. ANALYSIS

Melakeberhan brings ADEA discrimination and retaliation claims against Defendants Baird and Daum in their official capacities, and he seeks only injunctive relief in connection with these claims. MSU is a state actor, *Norris v. Stanley*, 73 F.4th 431, 436 (6th Cir. 2023), so sovereign immunity would bar an ADEA suit for damages against the university, *see Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91, 120 (2000). However, Melakeberhan can seek injunctive relief against MSU officers in their official capacities under the sovereign immunity exception articulated in *Ex Parte Young*, 209 U.S. 123 (1908). *See Meekison v. Voinovich*, 67 F. App'x 900, 901 (6th Cir. 2003) (plaintiffs can sue under *Ex Parte Young* to enforce ADEA).

*Ex Parte Young* allows suit when the plaintiff "seek[s] prospective relief to end a continuing violation of federal law." *Russell*, 784 F.3d at 1047 (quoting *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013)). Defendants argue that Melakeberhan's ADEA claims

7

do not satisfy this standard, and are thus barred by sovereign immunity.  Specifically, Defendants argue that Melakeberhan has not alleged that Baird and Daum were personally responsible for either discrimination or retaliation.  And as to the retaliation claim, Defendants argue that Melakeberhan has not alleged an *ongoing* violation of federal law.  The Court will address these arguments in turn.

### A. Defendants' Responsibility

To bring an *Ex Parte Young* suit against a state official, "[a] plaintiff must allege facts showing how a state official is connected to, or has responsibility for, the alleged constitutional violations." *Top Flight Ent., Ltd. v. Schuette*, 729 F.3d 623, 634 (6th Cir. 2013).  It is sufficient that "the state officer, by virtue of his office, has *some* connection" to the alleged violation.  *Ex Parte Young*, 209 U.S. at 157 (emphasis added); *accord Floyd v. City of Kent*, 454 F. App'x 493, 499 (6th Cir. 2012); *see also Luckey v. Harris*, 860 F.2d 1012, 1015 (11th Cir. 1988) ("Personal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity. All that is required is that the official be responsible for the challenged action.").

Melakeberhan alleges that "Baird is the Chair of the MSU Department of Horticulture," and "Daum is the Interim Dean of CANR."  (Am. Compl. ¶¶ 8-9.)  Thus, both Defendants presumably have authority over funding, promotions, salaries, and personnel evaluations—i.e., the areas in which Melakeberhan alleges discrimination and retaliation have occurred.  The supervisory offices held by these Defendants sufficiently establish the "connection" to the illegal conduct that *Ex Parte Young* requires, even if there is no allegation that they personally took part in that conduct.  *See Miller v. Calhoun County*, 408 F.3d 803, 817 n.3 (6th Cir. 2005) (fact that defendants "were not personally involved in the alleged misconduct" indicates they "are being sued in their official capacities"); *Rouse v. Washington*, No. 20-CV-11409, 2021 WL 2434196, at

8

*10 (E.D. Mich. June 15, 2021) ("[T]hese Defendants' lack of individual involvement is not a basis for dismissing the official capacity claims against them."); *Taaffe v. Drake*, No. 2:15-CV-2870, 2016 WL 1713550, at *6 (S.D. Ohio Apr. 29, 2016) ("It is useful to note that high-ranking university officials are typically named as defendants in suits invoking the ADEA, even if it seems likely that those officials were not directly involved in individual acts of discrimination.").

### B. Ongoing Violation

Melakeberhan's retaliation claim is based on a negative performance review that he allegedly received after reporting MSU's discrimination. Defendants contend that one past performance review is not the sort of ongoing violation that supports prospective relief under *Ex Parte Young*. In addition, Defendants argue that Melakeberhan forfeited his opposition to this argument by not sufficiently addressing it in his response brief. However, the Court is satisfied that Melakeberhan's brief sufficiently preserved his opposition to this argument (*see* Pl.'s Resp. 5-7), and thus will address the merits of the argument.

The Court of Appeals has explained that the "ongoing violation" element of the *Ex Parte Young* standard is satisfied if a plaintiff alleges the sort of imminent harm that creates Article III standing to seek an injunction. *Russell*, 784 F.3d at 1047 ("[A]t the point that a threatened injury becomes sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to satisfy this element of *Ex parte Young*."). Melakeberhan's complaint requests "[e]quitable relief, including an injunction prohibiting any further acts of wrongdoing against him." (Am. Compl. 16.) Though Melakeberhan does not specify the specific injunctive relief he seeks, it can be inferred from the nature of the harm alleged that he wants MSU to withdraw the negative performance review. *Cf. Tigrett v. Cooper*, 855 F. Supp. 2d 733, 744 (W.D. Tenn. 2012) ("Under the general prayers for relief in a complaint, it appears to be widely

9

accepted that district courts retain discretion to extend relief beyond the bounds of the specific prayers for relief requested in a complaint.").

"[E]xpunging disciplinary records is, as a practical matter, prospective relief." *Ashford v. Univ. of Mich.*, 89 F.4th 960, 969 (6th Cir. 2024); *see also Jensen v. Brown*, 131 F.4th 677, 697 (9th Cir. 2025) ("[T]he presence of negative performance evaluations or letters of reprimand in an employee's personnel file poses an obvious threat to career advancement."). Thus, "[i]njunctive relief is appropriate here, not [necessarily] because the defendants will [violate the law] again in the future, but because the past [violation] has continuing effects." *In re Flint Water Cases*, 960 F.3d 303, 334 (6th Cir. 2020). Because the Court can grant prospective relief to remedy the negative performance reviews, Melakeberhan satisfies *Ex Parte Young*'s sovereign immunity exception and can bring his ADEA claims.

## IV. CONCLUSION

For the reasons explained above, Defendants' motion to dismiss is granted in part and denied in part. The Court will dismiss the Title VII claims against Baird and Daum. However, the Court will deny the motion to dismiss the ADEA claims, as sovereign immunity does not bar suit.

An order consistent with this Opinion will issue.

Dated: September 29, 2025 /s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE